UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ATIF AHMAD RAFAY

                       Petitioner,

     v.

MICHAEL OBENLAND,

                    Respondent.

Case No. C16-1215-RAJ-MAT

REPORT AND RECOMMENDATION

INTRODUCTION AND SUMMARY CONCLUSION

Petitioner Atif Rafay is a Washington prisoner who is currently confined at the Monroe Correctional Complex.  He seeks relief under 28 U.S.C. § 2254 from a 2004 King County Superior Court judgment and sentence.  Respondent has filed an answer responding to petitioner's federal habeas claims and has submitted relevant portions of the state court record.  Petitioner has filed a response to respondent's answer.  This Court, having carefully reviewed petitioner's amended petition for writ of habeas corpus, all briefing of the parties, and the state court record, concludes that the amended petition should be denied and this action should be dismissed with prejudice.

FACTUAL/PROCEDURAL BACKGROUND

The Washington State Court of Appeals, on direct appeal, summarized the facts relevant

REPORT AND RECOMMENDATION
PAGE - 1

to petitioner's conviction as follows:

> At about 2:00 a.m. on Wednesday, July 13, 1994, Sebastian Burns called 911 to report "some sort of break-in" at the Bellevue home of [his friend] Atif Rafay's parents. Burns indicated there was blood all over and that Rafay's parents appeared to be dead. Burns and Rafay, both Canadian citizens, had been staying at the home since July 7.

> Bellevue police responded to the call within about five minutes and began an extensive investigation. Inside, police found Sultana Rafay, Rafay's mother, on the lower floor of the house and Tariq Rafay, Rafay's father, upstairs in his bed. Both had been bludgeoned to death. They found Basma Rafay, Rafay's sister, gasping and still alive in her room. She later died at the hospital from severe head wounds.

> After Burns and Rafay provided initial statements at the scene, officers drove them to the police station, where each gave a second statement.

> In their statements, Burns and Rafay explained that they had left the house at about 8 p.m. on the evening of July 12 and gone to the Keg Restaurant in Factoria for dinner. They then attended the 9:40 p.m. showing of *The Lion King* at the Factoria Cinema. Theater employees recalled Burns as one of the patrons who had reported a curtain malfunction shortly after the movie began. No one saw Burns or Rafay at the theater after about 10:00 p.m.

> After the movie, the two drove to Steve's Broiler in downtown Seattle, where they arrived about midnight. After leaving the restaurant, Burns and Rafay tried to enter the nearby "Weathered Wall" nightclub but arrived too late. They returned to Steve's Broiler, used the restroom, and drove back to Bellevue. Upon entering the lower level of the house, Burns and Rafay discovered Sultana's body and then Tariq's body upstairs. Rafay heard his sister moaning in her room. He told police that several items appeared to be missing, including his personal stereo and portable compact disc player and a family videocassette recorder (VCR).

> Bellevue police arranged for Burns and Rafay to stay in a Bellevue motel on July 13. Burns and Rafay each gave a third statement on the afternoon of July 14. On Friday, July 15, 1994, without telling the police, Burns and Rafay boarded a bus and returned to Vancouver, B.C. The two did not attend the family's funeral on Friday afternoon at a Northgate mosque. After staying for several weeks with Burns's parents, Burns and Rafay moved into a North Vancouver house with friends Jimmy Miyoshi and Robin Puga.

> Bellevue police traveled to Vancouver a few days after the murders but were unsuccessful in arranging any further contact with Burns or Rafay. Eventually, Bellevue police asked the RCMP [Royal Canadian Mounted Police] for assistance

REPORT AND RECOMMENDATION
PAGE - 2

in obtaining financial information about Burns and Rafay and DNA (deoxyribonucleic acid) samples.

In January 1995, Bellevue police detectives met with RCMP officers in Vancouver, and the RCMP agreed to assist.  The RCMP also opened their own investigation into whether the defendants had been involved in a conspiracy to commit murder while in Canada.  The RCMP obtained judicial authority to place wiretaps and audio intercept devices in the defendants' home and in their car and eventually obtained more than 4,000 hours of recordings.

In April 1995, the RCMP began an undercover operation similar to others it used in many Canadian cases over the years.  Dubbed "Project Estate," undercover officers posed as the leaders of a successful criminal organization.  Sergeant Al Haslett and Corporal Gary Shinkaruk were the primary undercover operators, with Haslett acting as "Mr. Big," the apparent head of the fictitious organization, and Shinkaruk as his subordinate.  The operation eventually planned and carried out the following 12 "scenarios" in an effort to secure confessions:

*No. 1  April 11, 1995*    For the initial meeting, Shinkaruk staged an encounter with Burns outside a hair salon after Burns had a haircut.  Shinkaruk told Burns that he had locked his keys in his car and asked for a ride back to his hotel.  When Burns mentioned he needed $200,000 for a movie he was planning, Shinkaruk offered to introduce him to "Al" as a possible investor.  Shinkaruk accompanied Burns to a strip club and introduced him to Haslett.  Burns expressed interest in Haslett's offer to earn extra money.

*No. 2  April 13, 1995*    Haslett contacted Burns and directed him to drive with Shinkaruk to Whistler, where the two met with Haslett.  When Haslett asked Burns to drive a stolen car back to Vancouver, Burns appeared pale and expressed concern about the plan.  Burns eventually drove what he believed to be a stolen car back to Vancouver, where Haslett paid him $200.  Burns repeatedly expressed his dissatisfaction with the amount he had earned and his lack of participation in the planning of the operation.  Burns indicated he was willing to participate in more lucrative future operations, including selling drugs and acting as a "hit man."

*No. 3  April 20-21, 1995*    Shinkaruk left a telephone message for Burns.  Burns returned the call and indicated his willingness to meet with Shinkaruk in a few days.

*No. 4  May 6, 1995*    At the Four Seasons Hotel, an undercover officer, dressed as a biker, displayed two guns and delivered a large amount of cash to Shinkaruk.  Burns watched and then helped Shinkaruk count the money. Shinkaruk told Burns he had "fuckin' toasted a guy," but Haslett had made sure the witness was unavailable for trial.

REPORT AND RECOMMENDATION
PAGE - 3

During the meeting, Burns disclosed that he and a friend were suspects in the Bellevue murders. Burns claimed that he now had enough money to make his movie but remained interested in certain future opportunities, including money laundering and drug sales. He also said he would not have "any dilemma" about killing someone for the organization and that "anything goes." Burns repeatedly resisted Haslett's questions about committing the murders but also indicated his desire to learn more about what the Bellevue police knew and to have evidence destroyed.

*No. 5 May 29-30, 1995* Shinkaruk became concerned that a recent newspaper article may have compromised the operation. He called Burns. Burns said he was glad to hear from Shinkaruk and available to meet with him. Shinkaruk said he would call the next day and set up a meeting. After the call, the electronic intercept recorded Burns singing, "I'm a happy man." When Shinkaruk called the next day, he told Burns that Haslett was busy and nothing would be scheduled that day. Burns expressed disappointment.

*No. 6 June 15-16, 1995* On June 13, 1995, Shinkaruk called Burns and asked if he was interested in making some money. Shinkaruk invited Burns to bring a trusted friend and meet him at the Royal Scott Hotel in Victoria. Burns asked Miyoshi to join him. The two met with Haslett and Shinkaruk in Victoria on June 15, 1995. For two days, Burns and Miyoshi assisted Shinkaruk with "money laundering" by making cash deposits totaling about $100,000 into various bank automated teller machines. Haslett provided Burns and Miyoshi with spending money and $2,000 at the end of the second day.

During the course of the encounter, Burns twice asked Haslett what he had learned about the Bellevue investigation. Haslett said he had someone investigating the matter and would inform Burns what he learned. Haslett also discussed computer skills with Burns and Miyoshi, suggesting future employment possibilities. After Haslett and Shinkaruk left, Burns told Miyoshi that "[t]his has been the coolest thing ever I couldn't ask for anymore [sic]."

*No. 7 June 20, 1995* After calling Burns and telling him they might visit, Haslett and Shinkaruk appeared at the defendants' house. Haslett discussed Burns's computer knowledge and system and told Burns he would soon be hearing from a friend with information about the Bellevue police investigation. Burns warned Haslett that the house was bugged.

*No. 8 June 28-29, 1995* Burns and Miyoshi returned to Victoria for a second round of money laundering. Haslett arranged to speak alone with Burns and told him that the Bellevue police had him "in a pretty big fucking way." Haslett mentioned that the police had evidence of Burns's DNA, his hair found in the shower mixed with the victims' blood, and Burns's fingerprints on a box. Haslett said he needed more details in order to help Burns.

REPORT AND RECOMMENDATION
PAGE - 4

Burns repeatedly deflected Haslett's attempts to elicit concrete details about the murders but provided some veiled responses suggesting his participation and a financial motive. Burns also expressed concern that Haslett was an undercover officer. Haslett discussed computers again with Burns but did not pay Burns or Miyoshi for their assistance.

*No. 9  July 10, 1995*    To avoid appearing to focus on Burns, Haslett and Shinkaruk arranged a money laundering operation involving only Miyoshi. Miyoshi did not reveal any details about the murders.

*No. 10  July 18, 1995*    Burns agreed to meet with Haslett and Shinkaruk at the Ocean Point Hotel in Victoria. At the hotel, Haslett discussed the organization's computer needs with Burns. Haslett then showed him a fake Bellevue Police Department memorandum that indicated the police would soon call a press conference and that charges would be filed against Burns and Rafay once the culturing of Burns's DNA was completed. Haslett told Burns that things would be happening quickly and that the police were "coming to lock your ass up."

After studying the report and discussing with Haslett the specific items of evidence that it listed, Burns insisted that the items all had potentially innocent explanations. Burns eventually acknowledged, however, that he wanted Haslett's help. Haslett told Burns that he could arrange for his associate to destroy the evidence, but that he would not do so until Burns told him the complete details of the murders. Haslett explained that the associate could not destroy all of the evidence unless he knew the details of the crime.

Burns eventually told Haslett specific details about his and Rafay's participation in the murders. A hidden camera recorded Burns's confession.

*No. 11  July 19, 1995*    Haslett told Burns to call Rafay and ask him to come to Victoria. While waiting for Rafay to arrive, Burns accompanied Shinkaruk to Nanaimo, where Shinkaruk staged an encounter with another undercover officer. While Burns stood guard, Shinkaruk appeared to rough up the man in order to obtain more than $100,000 that he owed to Haslett. Shinkaruk and Burns then returned to Haslett's hotel room, where all three men counted the money. Burns provided additional details about the murders to Haslett.

Rafay arrived, and Haslett spoke at length with him in Burns's presence. Haslett discussed the details of the Bellevue memo with Rafay and repeatedly emphasized the importance of trust. Rafay reassured him that Burns was his best friend and that he would never betray him. Rafay then provided details about his participation in the murders. He explained that he had watched Burns kill his mother and had removed the family VCR but had not otherwise participated in the killings. When asked why they had killed his parents, Rafay responded that it was

REPORT AND RECOMMENDATION
PAGE - 5

to "become richer and more prosperous and more successful." Burns also added additional details about the killing of Basma, which "took a little more bat work" than he had expected. The RCMP also videotaped Rafay's confessions.

*No. 12  July 26, 1995*    In the final scenario, Burns and Miyoshi met with Haslett at the Landis Hotel in Vancouver. At Burns's urging, Miyoshi told Haslett that he knew about the plan to kill Rafay's parents about a month in advance. He explained that he did not go to Bellevue with the defendants because he was too busy at work.

On July 31, 1995, Burns and Rafay were charged in King County with three counts of aggravated first-degree murder. On the same day, the RCMP arrested them and charged them as fugitives. King County requested extradition of Burns and Rafay and refused to waive the potential application of the death penalty. After protracted litigation, the Canadian Supreme Court ruled on February 15, 2001, that the defendants could not be extradited without a waiver of the death penalty. King County then provided the required assurances. Burns and Rafay were transported to Washington and arraigned on April 6, 2001.

Miyoshi eventually told officers that he had known about the planned murders and discussed the plan with the defendants. When Burns and Rafay returned to Canada after the murders, they told Miyoshi certain details about the killings. Miyoshi entered into an immunity agreement and in August 2003 participated in a videotaped preservation deposition that was played at trial.

After a series of delays caused in part by the need to appoint new attorneys, testimony on the defendants' motions to suppress their confessions began on April 22, 2003, and concluded on August 6, 2003. Jury selection began on October 10, 2003, and concluded on November 13, 2003. Opening statements began on November 24, 2003, and closing statements concluded on May 20, 2004. The jury returned its verdict on May 26, 2004, finding the defendants guilty as charged. At sentencing on October 24, 2004, the court imposed three terms of life imprisonment without the possibility of parole on each defendant.

*State v. Rafay*, 168 Wash. App. 734, 747-54 (2012); *see also* Dkt. 52, Ex. 2 at 2-12.

Petitioner and Mr. Burns appealed their convictions to the Washington Court of Appeals and the appeals were consolidated for review. *See* Dkt. 52, Exs. 4-10. On June 18, 2012, the Court of Appeals issued a lengthy published opinion affirming the convictions. *Id.*, Ex. 2. Petitioner thereafter filed a motion for reconsideration which was denied by the Court of Appeals on July 24, 2012. *See id.*, Exs. 11, 12. Petitioner and Mr. Burns next sought discretionary review by the

REPORT AND RECOMMENDATION
PAGE - 6

Washington Supreme Court of the Court of Appeals' decision affirming their convictions.  *See id.*, Exs. 13, 14.  The Supreme Court denied the consolidated petitions for review without comment on March 7, 2013.  *See id.*, Ex. 19.  On March 19, 2013, the Supreme Court issued an amended order denying review in which it made clear that the defendants' motions for permission to adopt arguments from each other's petitions for review had been granted.  *See id.*, Ex. 20.  The Court of Appeals issued its mandate on March 22, 2013, and subsequently issued an amended mandate on September 6, 2013.  *Id.*, Exs. 21, 22.

On October 7, 2014, petitioner filed a personal restraint petition in the Washington Supreme Court, and the Supreme Court transferred the petition to the Washington Court of Appeals for consideration.  *Id.*, Exs. 23, 24.  The Court of Appeals issued an order dismissing the petition on October 8, 2015.  *Id.*, Ex. 30.  Petitioner thereafter sought discretionary review by the Washington Supreme Court.  *See id.*, Exs. 31, 32.  The Supreme Court Commissioner issued a ruling denying review on September 15, 2016.  *Id.*, Ex. 33.  Petitioner moved to modify the Commissioner's ruling and that motion was denied by the Chief Justice of the Supreme Court on December 7, 2016.  *Id.*, Exs. 34, 35.  The Court of Appeals issued a certificate of finality in petitioner's personal restraint proceedings on December 23, 2016.  *Id.*, Ex. 36.

On April 7, 2016, while his first personal restraint petition was still pending, petitioner filed a second personal restraint petition in the Washington Supreme Court.  *Id.*, Ex. 38. Petitioner's second petition, like his first petition, was transferred to the Washington Court of Appeals for consideration.  *Id.*, Ex. 37.  The Court of Appeals issued an order dismissing petitioner's second personal restraint petition on June 2, 2017.  *Id.*, Ex. 41.  Petitioner sought discretionary review by the Washington Supreme Court, and the Supreme Court Commissioner issued a ruling denying review on October 12, 2017.  *Id.*, Exs. 42, 43.  Petitioner moved to modify

REPORT AND RECOMMENDATION
PAGE - 7

1   the Commissioner's ruling and that motion was denied by the Chief Justice of the Supreme Court

2   on January 3, 2018.  *Id.*, Exs. 44, 45.  The Court of Appeals issued a certificate of finality in

3   petitioner's second personal restraint proceedings on January 19, 2018.  *Id.*, Ex. 46.

4          On August 2, 2016, petitioner filed in this Court a *pro se* petition for writ of habeas corpus

5   together with a motion to appoint counsel and a motion to stay the federal habeas action pending

6   completion of petitioner's two state court collateral review proceedings.  *See* Dkt. 1.  The Court

7   granted petitioner's motions, appointing the Federal Public Defender to represent petitioner and

8   staying this action pending final resolution of petitioner's state court proceedings.  *See* Dkts. 8, 9.

9   The stay was lifted on August 6, 2018, and petitioner was granted leave to file an amended petition.

10  *See* Dkt. 14.  Petitioner's amended petition for writ of habeas corpus was filed February 6, 2019.

11  Dkt. 34.  Petitioner's amended petition is the operative petition in this action, and that petition is

12  now ripe for consideration.

## GROUNDS FOR RELIEF

14         Petitioner identifies four grounds for relief in his amended petition:

15  GROUND ONE:  Admission of statements gathered during Canada's Mr. Big
    operation violated Atif's due process rights under the Fifth and Fourteenth
16  Amendments.

17  GROUND TWO:  Atif's attorneys rendered ineffective assistance, in violation of
    his rights under the Sixth Amendment to the U.S. Constitution, when they advised
18  him that testifying at the suppression hearing had no utility because the silver platter
    doctrine meant coercion only mattered if the court was inclined to find that the Mr.
19  Big scenarios were a joint operation of the U.S. and Canadian authorities rather
    than an exclusively Canadian operation.
20
    GROUND THREE:  Exclusion of "other suspect" evidence, as well as testimony
21  from defense experts Richard Leo and Michael Levine, violated petitioner's right
    to present a complete defense at trial in violation of the Sixth and Fourteenth
22  Amendments to the United States Constitution.

23  GROUND FOUR:  Repeated misconduct on the part of the prosecutor and

REPORT AND RECOMMENDATION
PAGE - 8

statements by key law enforcement witnesses offering opinions as to guilt denied petitioner a fair trial in violation of the Sixth Amendment to the United States Constitution.

*See* Dkt. 34 at 70, 77, 82, 90.

DISCUSSION

Respondent concedes that petitioner properly exhausted his four grounds for federal habeas relief by properly presenting the claims to the Washington Supreme Court for review on direct appeal and in the first of his two personal restraint proceedings.[1] *See* Dkt. 51 at 11.  Respondent argues, however, that petitioner is not entitled to relief in this federal habeas action with respect to any of his asserted claims. *See id*. at 15-52.

Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a habeas corpus petition may be granted with respect to any claim adjudicated on the merits in state court only if (1) the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or (2) the decision was based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d). In considering claims pursuant to § 2254(d), the Court is limited to the record before the state court that adjudicated the claim on the merits, and the petitioner carries the burden of proof.  *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011).

Under § 2254(d)(1)'s "contrary to" clause, a federal court may grant the habeas petition

---

[1] Respondent argues with respect to a portion of petitioner's fourth ground for relief pertaining to alleged improper opinion testimony by law enforcement witnesses that the claim has not been exhausted to the extent it is being presented here as a claim alleging prosecutorial misconduct. Dkt. 51 at 51.  Petitioner argues that this portion of his fourth ground for relief has, in fact, been exhausted. *See* Dkt. 57 at 28.  The Court will address the exhaustion issue below in its analysis of petitioner's fourth ground for relief.

REPORT AND RECOMMENDATION
PAGE - 9

only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ only if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *See id.* at 407-09.

The Supreme Court has made clear that a state court's decision may be overturned only if the application is "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). The Supreme Court has further explained that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 88 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Clearly established federal law, for purposes of AEDPA, means "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer*, 538 F.3d at 71-72. This includes the Supreme Court's holdings, not its dicta. *Id.* "If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

Under § 2254(d)(2), a petitioner may only obtain relief by showing that the state court's conclusion was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." "To show such an error occurred, the petitioner must establish that the state court's decision rested on a finding of fact that is '*objectively*

REPORT AND RECOMMENDATION
PAGE - 10

unreasonable.'" *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012) (quoting *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004)) (emphasis in original); *see also Lockyer*, 538 U.S. at 75. "Factual findings are objectively unreasonable if they are unsupported by sufficient evidence in the state court record." *Tong Xiong v. Felker*, 681 F.3d 1067, 1074 (9th Cir. 2012). In addition, the Court presumes the state court's factual findings to be sound unless the petitioner rebuts "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Ground One:  Coerced Confession

Petitioner asserts in his first ground for relief that improper coercive techniques were used to obtain his confession, in violation of his rights under the Fifth and Fourteenth Amendments, and that the state courts' determination that his confession was voluntary and properly admitted into evidence was an unreasonable application of clearly established law and was based on an unreasonable determination of the facts. *See* Dkt. 34 at 70-77.

The United States Constitution requires that any confession admitted at trial be voluntarily given. *Dickerson v. United States*, 530 U.S. 428, 433 (2000). In determining whether a confession was voluntary, courts examine "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." *Id*. at 434 (citation and internal quotation marks omitted). "The due process test takes into consideration 'the totality of all the surrounding circumstances— both the characteristics of the accused and the details of the interrogation.'" *Id*. (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)); *see also Arizona v. Fulminante*, 499 U.S. 279, 285-88 (1991). "The determination 'depend[s] on a weighing of the circumstances of pressure against the power of resistance of the person confessing.'" *Dickerson*, 530 U.S. at 434 (quoting *Stein v. New York*, 346 U.S. 156, 185 (1953)).

The circumstances the Supreme Court has looked to in analyzing the totality of the

REPORT AND RECOMMENDATION
PAGE - 11

circumstances include the "crucial element of police coercion"; the length of the interrogation, its location, and its continuity; and, the defendant's maturity, education, physical condition, and mental health. *Withrow v. Williams*, 507 U.S. 680, 693 (1993); *see also Schneckloth*, 412 U.S. at 226. "Coercion can be mental or physical, but to render a statement involuntary, coercion must exist to such a degree that the statement is not 'the product of an essentially free and unconstrained choice by its maker.'" *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (quoting *Schneckloth*, 412 U.S. at 225).

Prior to trial, petitioner and Mr. Burns moved to suppress statements they made to undercover RCMP officers implicating themselves in the murders of petitioner's family. The trial court conducted extensive pretrial hearings after which it denied the defendants' motions to suppress their confessions. The trial court briefly addressed defendants' claim that their confessions were coerced in its oral ruling on the motions:

> The defendants do clearly enjoy the protections of the U.S. Constitution, the Fifth, Sixth, and the 14th Amendment[s], insofar as due process. Were defendants' rights under these laws violated? The court's answer is no.
>
> The statements of defendants were given . . . in a noncustodial setting. The defendants were free to speak or not. The defendants were free to leave or not. The defendants were free to consult their Canadian counsel or not, as they chose.
>
> The Canadian court reviewed and found no evidence of coercion, and this court makes the same finding. The Canadian court, in reviewing the self same issue under Canadian charter rights, found no duress, found nothing under Canadian police standards that would bring the administration of justice into disrepute.

*See Rafay*, 168 Wash. App. at 756.

This portion of the trial court's ruling was subsequently incorporated into its written findings of fact and conclusions of law as follows:

> [Finding of Fact] 15. During the course of the extradition proceedings in Canada,

REPORT AND RECOMMENDATION
PAGE - 12

the Court of Appeals for British Columbia found the undercover technique used by the RCMP and the resulting interception and recording of the defendants' communications did not violate the defendants' rights under Canada's Charter of Rights and Freedoms, nor did it offend the sensibilities of the Canadian citizenry. The Court of Appeals for British Columbia further found that there was no duress or coercion employed by the RCMP during the undercover scenarios in order to obtain the defendants' admissions. The Supreme Court of Canada did not disturb this finding. This Court agrees with the Canadian courts and finds the same.

....

[Conclusion of Law] 6. The defendants' statements and admissions to undercover RCMP officers during the course of the undercover scenarios were not the product of coercion or duress and their admission into evidence will not violate the defendants' due process rights, right to counsel or right against self incrimination guaranteed by the State and Federal Constitutions. The statements at issue were made in a non-custodial setting. The defendants were free to leave or not leave. The defendants were free to speak or not speak. The defendants were free to consult their Canadian counsel or not as they chose.

*Id.* at 756-57 (footnote omitted).

Petitioner and Mr. Burns, on direct appeal, challenged the trial court's determination that their confessions were voluntary under the Fifth and Fourteenth Amendments. The Court of Appeals began its analysis of this claim by articulating the totality of the circumstances test that courts apply to determine the voluntariness of a confession. *Id.* at 758 (citing, *inter alia*, *Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991)). The Court then summarized the defendants' arguments:

Defendants contend that Project Estate employed coercive techniques on an unprecedented scale against young and naïve suspects. Initially, the undercover operation sought to entice defendants by projecting an attractive lifestyle for participants in a criminal organization. When the operation's initial scenarios did not persuade Burns to confess, the officers arranged a series of "money laundering" tasks, for which Burns received several thousand dollars for negligible work. Haslett also implied the defendants could provide future computer consulting services for the organization once their legal troubles were eliminated.

Defendants rely primarily on evidence that Haslett and Shinkaruk created the image of a criminal organization that was willing to use guns and violence if

REPORT AND RECOMMENDATION
PAGE - 13

necessary to protect its interests. During the scenario on May 6, 1995, Shinkaruk informed Burns that he had killed someone in the past, and Haslett suggested he had had a witness "eliminated." On July 19, 1995, the day after Burns's videotaped confession, Burns accompanied Shinkaruk to a staged incident and stood guard while Shinkaruk purportedly punched someone in order to collect money. Haslett repeatedly stressed that he valued loyalty above all else and expressed concern that defendants might betray the organization if they ever went to jail. Defendants argue that the officers' comments and actions impliedly threatened violence or death if the police arrested the defendants, who would then pose some risk of revealing the organization's secrets to the police.

Defendants maintain that in order to create a sense of urgency and finally persuade them to abandon their steadfast refusal to provide details about the murders, Haslett confronted Burns with a fake Bellevue Police Department memorandum and repeatedly admonished him that arrest was imminent unless defendants agreed to Haslett's plan to destroy evidence. That plan not only promised defendants an unhindered opportunity for future participation in the organization, it also eliminated the possibility that they would spend time in jail, where they posed a threat of disclosing information about Haslett and Shinkaruk to the police. Defendants provided details about the murders only after Haslett's offer to eliminate future criminal liability.

Defendants argue that these circumstances, considered together, were so coercive they prevented the defendants from making a rational decision. Defendants claim they confessed only as a direct result of this final threat in order to avoid arrest, prosecution, and possible death.

*Id.* at 758-59.

The Court of Appeals, applying the totality of the circumstances test to evaluate whether the confessions were voluntary, concluded as follows:

Although Haslett and Shinkaruk portrayed their criminal organization as one that had used violence on occasion to achieve its goals or protect its members, the record does not indicate that they ever threatened the defendants with physical harm or placed them in a position suggesting they were subject to imminent physical harm.

Moreover, the interaction between the defendants and the undercover officers in this case encompassed a period of several months. As the trial court stressed, the defendants were free to break off their contact with the undercover officers at any time. On one occasion, weeks passed with no contact between the participants. Throughout the undercover operation, defendants pursued their normal and chosen activities with no interference from the undercover officers.

REPORT AND RECOMMENDATION
PAGE - 14

During Project Estate, the defendants repeatedly pursued their contacts with Haslett and Shinkaruk, expressed their willingness to participate in the organization's criminal activities, including acts of violence, and requested Haslett's assistance in avoiding future prosecution. Defendants do not identify any evidence in the record suggesting that their age, mental abilities, education, emotional condition, or specific personality traits left them unusually vulnerable to coercive measures. Nor does the record establish that the defendants were financially dependent on the money they received from Haslett.

Throughout the entire undercover operation, Burns, who essentially managed the relationship with Haslett and Shinkaruk on behalf of the defendants, exhibited a remarkable resilience to continued pressure. In the earlier scenarios, Burns was not intimidated and resisted Haslett's repeated attempts to extract information about the murders. Although Burns appeared scared or nervous during the stolen car scenario, he did not hesitate to complain afterward about the amount of money he had earned and his unhappiness about not participating in the planning of the operation. Burns clearly attempted to leverage the incident to a more lucrative relationship with the organization. Even when confronted with the fake police memo, Burns firmly and accurately responded that the purported evidence was equivocal and was either easily explained or simply unrelated to the defendants' actions during the murders.

Although defendants claim they confessed out of fear of physical injury, Burns expressly raised the subject with Haslett on several occasions, casually asserting his expectation that the organization would shoot him if he ever betrayed it. But Haslett repeatedly suggested to Burns that if things did not work out, the parties would just walk away from one another. During the second money laundering scenario in Victoria, Haslett commented that Burns only had Shinkaruk's pager number and informed him that if mistakes were made, the "pager will be fuckin' thrown in the fuckin' ocean and that'll be the end of it." Near the end of the confession recording, Burns assures Haslett that he can trust him because otherwise "some guy [would come and] blast me in the head." In response, Haslett insists that he is "not a killer" and that because he and Burns have not done anything together at this point, either one is free to walk away if there is a lack of trust. Haslett also repeatedly asserts that Burns is free to talk to his attorney. Burns's actions throughout suggest deliberate attempts to impress Haslett, not fear of physical injury.

Significantly, unlike any of the authorities cited on appeal, the record in this case includes many hours of audio and video recordings made in the defendants' house and during the various scenarios. Those recordings provided a uniquely rich context for assessing the effect of the undercover operations on the defendants. The trial court was therefore able to view the defendants' demeanor and body language during the entire confessions, including their jovial delight in revealing certain details about the murders and Rafay's calm explanation that his feelings about

REPORT AND RECOMMENDATION
PAGE - 15

killing his parents and sister were tempered by the fact that "[i]t was necessary to . . . achieve what I wanted to achieve in this life . . . . I think of it as a sacrifice . . . a sort of injustice in the world that basically, basically forced me or, and Sebastian, to . . . have to do the thing." This documentation severely undermined the defendants' claims that the undercover operations overcame their will to resist.

Viewed in their entirety, the circumstances in the case, including the defendants' private conversations, their participation in the scenarios leading up to the confessions, and their conduct and statements during the confessions themselves, indicate that Project Estate did not vitiate the defendants' ability to make independent or rational decisions or otherwise overcome their will. Although psychological and financial factors undoubtedly played a role in the relationship between the defendants and the undercover officers, the record does not indicate that those extrinsic considerations were overwhelming. Rather, defendants made a deliberate choice after weighing competing options, including their long-term personal goals, to accept the assistance of another criminal to eliminate their legal problems. A confession is voluntary "'so long as that decision is a product of the suspect's own balancing of competing considerations.'"[2] The evidence in the record strongly supports the trial court's determination that defendants' confessions were voluntary.

*Id.* at 762-66.

Petitioner asserts that the Mr. Big operation "placed overwhelming coercive pressure" on him and on Mr. Burns "to provide fabricated confessions to avoid their arrests and subsequent murders at the hands of the fake criminal organization." Dkt. 34 at 72. Petitioner argues that the state courts unreasonably concluded that the confessions were not motivated by fear that the criminal organization would kill them to keep them quiet if their arrests became imminent. *Id.* Petitioner further argues that the Court of Appeals unreasonably applied the totality of the circumstances test because it made an unreasonable determination of the facts. *Id.* at 75. Petitioner maintains that there was a credible threat of violence against both him and Mr. Burns from the undercover officers and that they provided false confessions in reaction to those threats. *Id.*

---

[2] [Court of Appeals Footnote 20] *Unga*, 165 Wash.2d at 102, 196 P.3d 645 (quoting *Miller*, 796 F.2d at 605).

REPORT AND RECOMMENDATION
PAGE - 16

Petitioner is effectively challenging the admission of not only his own inculpatory statement to the RCMP officers but that of Mr. Burns as well. Indeed, a majority of the argument set forth in the amended petition in support of this claim relates to Mr. Burns's interactions with the RCMP officers. This is no doubt because, as the Court of Appeals observed, Mr. Burns managed the relationship with the undercover officers on behalf of defendants. Unlike Mr. Burns who had multiple interactions with the undercover officers, and actively participated in most of the scenarios set up by those officers, petitioner had only a single interaction with the undercover officers.

The issue of whether Mr. Burns's statements to the undercover officers were obtained through coercion and therefore improperly admitted at trial was previously decided in the context of Mr. Burns's federal habeas petition. *Burns v. Warner*, C14-850-MJP (W.D. Wash., dismissed Dec. 16, 2015). In Mr. Burns's federal habeas action, the Court concluded, based on statements Mr. Burns made to undercover officers on June 28-29, 1995, and on July 18, 1995, that there was evidence of an implicit credible threat of physical harm to Mr. Burns if he betrayed Haslett; *i.e.*, Mr. Big. *See id.*, Dkt. 28 at 20; Dkt. 35 at 11-12. The Court also concluded, however, that there was insufficient evidence to demonstrate a causal connection between the implied threat of harm and Mr. Burns's confession. *See id.*, Dkt. 28 at 22; Dkt. 35 at 12. As was explained in the Report and Recommendation issued in Mr. Burns's habeas case, "a credible threat of physical harm alone is insufficient to establish that a confession was coerced. Rather, there must be evidence that the petitioner confessed *in response* to that threat." *Id.*, Dkt. 28 at 20 (citing *Fulminante*, 499 U.S. at 288.)

This Court will not revisit issues concerning the admissibility of the statements made by Mr. Burns to the undercover officers as those issues were soundly decided in Mr. Burn's federal

REPORT AND RECOMMENDATION
PAGE - 17

1  habeas action. *See id.*, Dkts. 28, 35, 38. This Court need only consider the circumstances

2  surrounding petitioner's statement to the undercover officers. As noted above, while Mr. Burns

3  met with the undercover officers on numerous occasions, petitioner met with the officers once, on

4  July 19, 1995, the day he actually confessed to his participation in the murders of his parents and

5  his sister.

6      In order for petitioner to prevail on his claim that his confession was coerced, there must

7  be clear and convincing evidence in the record of (1) a credible threat of physical harm that (2)

8  motivated petitioner to confess. *See Fulminante*, 499 U.S. at 287-88. Nothing in the transcript of

9  petitioner's July 19 meeting with the undercover officers suggests that any threats were made to

10 him during that meeting. *See* Dkt. 52, Ex. 74. The audio and video recording of that meeting,

11 which is also a part of the record before this Court, likewise reveals no express threats nor any

12 obviously threatening behavior directed toward petitioner by the undercover officers. *Id.*, Ex. 72.

13 In fact, petitioner looked relatively calm and relaxed during the meeting. *See id.*

14     Petitioner asserts that the record contains evidence demonstrating that the undercover

15 officers communicated threats to petitioner either directly or through Mr. Burns. Dkt. 57 at 5.

16 However, petitioner fails to point to any evidence which actually supports that assertion. Petitioner

17 primarily relies on interactions Mr. Burns had with the undercover officers, and he invites the

18 Court to speculate that threats communicated to Mr. Burns during his multiple interactions with

19 the officers were passed along to petitioner and that those threats resulted in a false confession.

20 *See id.* The Court declines this invitation. Even assuming, as petitioner suggests, that the

21 undercover officers intended the implied threats of harm communicated in Mr. Burns's presence

22 to be passed along to petitioner, there is no evidence that they actually were, nor is there even a

23 scintilla of evidence that any such threats caused petitioner to confess. The evidence in the record

REPORT AND RECOMMENDATION
PAGE - 18

before this Court does not demonstrate that petitioner's confession was coerced.

The Court notes that petitioner, in his response to respondent's answer, spends considerable time complaining about the reasonableness of the state trial court's decision regarding admission of the confessions. Petitioner argues, in particular, that the trial court erred by reviewing the evidence with an erroneous legal standard and improperly relying on Canadian law. Dkt. 57 at 10-12. However, on habeas review, this Court looks to the last reasoned decision of the state court, which in this case is the Court of Appeals' decision. *See Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002) ("In determining whether a state court decision is contrary to federal law, we look to the state's last reasoned decision . . . as the basis for its judgment.")) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

The Washington Court of Appeals concluded that the trial court applied the correct legal standard and made an independent determination of voluntariness under the Fifth and Fourteenth Amendments. *Rafay*, 168 Wash. App. at 766. And, as reflected above, the Court of Appeals concluded that the record strongly supported the trial court's determination of voluntariness. *Id.* at 765. Petitioner fails to demonstrate that the Washington appellate court's decision with respect to his coerced confession claim is contrary to, or involved an unreasonable application of, clearly established federal law. He also fails to demonstrate that the appellate court's decision was based on an unreasonable determination of the facts. Accordingly, petitioner's first ground for federal habeas relief should be denied.

<u>Ground Two: Ineffective Assistance of Counsel</u>

Petitioner asserts in his second ground for relief that his attorneys rendered ineffective assistance when they advised him not to testify at the pretrial suppression hearing based on their misunderstanding of the applicable law. *See* Dkt. 34 at 77-80. Petitioner claims that he had a

REPORT AND RECOMMENDATION
PAGE - 19

strong argument for suppression; *i.e.*, that the statements made to the Canadian undercover officers were elicited in violation of his rights under the Fifth Amendment, and that his testimony was vital to establish that he and Mr. Burns were in fear for their lives when communicating with the undercover officers. *Id*. at 77-78. Petitioner maintains that his attorneys erroneously believed such testimony was irrelevant because, under the silver platter doctrine, coercion was immaterial if the Canadian authorities were acting independently of their American counterparts.[3] *See id*. at 78-80.

Petitioner argues that while the silver platter doctrine is applicable to Fourth Amendment issues it does not govern issues arising under the Fifth Amendment pertaining to the voluntariness of his confession. *See id*. at 78-79. Petitioner further argues that there was no strategic benefit to not testifying at the suppression hearing, and that he would have testified had he not been misadvised by counsel that his testimony could have no possible benefit. *See id*. at 77-79. Petitioner maintains that if he had testified, the coerced confessions would have been suppressed and there is a significant probability that the outcome of the trial would have been different. *Id*. at 78-79.

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986). Claims of ineffective assistance of counsel are evaluated

---

[3] The "silver platter" doctrine permits state courts to admit evidence obtained from a federal or foreign jurisdiction if the evidence was obtained legally in that jurisdiction and state police did not assist and cooperate in the foreign investigation. *See State v. Gwinner*, 59 Wash. App. 119, 124-25 (1990).

REPORT AND RECOMMENDATION
PAGE - 20

under the two-prong test set forth in *Strickland*. Under *Strickland*, a defendant must prove (1) that counsel's performance was deficient and, (2) that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687.

With respect to the first prong of the *Strickland* test, a petitioner must show that counsel's performance fell below an objective standard of reasonableness. *Id*. at 688. Judicial scrutiny of counsel's performance must be highly deferential. *Id*. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*. at 689. In order to prevail on an ineffective assistance of counsel claim, a petitioner must overcome the presumption that counsel's challenged actions might be considered sound trial strategy. *Id*.

The second prong of the *Strickland* test requires a showing of actual prejudice related to counsel's performance. In order to establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. The reviewing court need not address both components of the inquiry if an insufficient showing is made on one component. *Id*. at 697.

While the Supreme Court established in *Strickland* the legal principles that govern claims of ineffective assistance of counsel, it is not the role of the federal habeas court to evaluate whether defense counsel's performance fell below the *Strickland* standard. *Harrington*, 562 U.S. at 101. Rather, when considering an ineffective assistance of counsel claim on federal habeas review, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Id*. As the Supreme Court explained in *Harrington*, "[a] state court must be

REPORT AND RECOMMENDATION
PAGE - 21

granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.*

Petitioner presented the ineffective assistance of counsel claim at issue here to the state courts in the first of his two personal restraint petitions, and the Washington appellate courts rejected the claim. *See* Dkt. 52, Exs. 31, 33. The Washington Supreme Court Commissioner, in her ruling deny petitioner's motion for discretionary review, first identified the standard applicable to petitioner's ineffective assistance of counsel claim:

> To establish ineffective assistance entitling him to relief, Mr. Rafay must demonstrate that counsel's performance was professionally deficient and that such deficiency caused him prejudice. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 840-47, 280 P.3d 1102 (2012). Counsel's performance is viewed in light of the entire record. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Decisions based on tactical and strategic reasons do not reflect deficient performance. *State v. Grief*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). Counsel is presumed competent; therefore, Mr. Rafay must show there were no conceivable legitimate strategic or tactical reasons for the challenged performance. *Id*. at 42. And to establish prejudice, Mr. Rafay must demonstrate that, but for the deficiency, there is a reasonable probability the trial result would have been different. *Crace*, 174 Wn.2d at 842.

*Id.*, Ex. 33 at 3-4.

The Commissioner then went on to explain her conclusion that petitioner had not demonstrated he was denied effective assistance of counsel in relation to his claim that counsel failed to properly advise him regarding testifying at the suppression hearing:

> Mr. Rafay asserts that defense counsel failed to adequately advise him of the law as it applied to the voluntariness of confessions such that Mr. Rafay decided not to ask to testify at his suppression hearing. He contends counsel advised him that he did not have a right to have a coerced confession suppressed if it was independently obtained by the RCMP. There is nothing to indicate Mr. Rafay's assertion of his recollection of counsel's advice is reliable. *See In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992) (personal restraint petitioner may not rely on bare assertions and conclusory allegations lacking proper evidentiary support). *Cf. United States v. Wisniewski*, 478 F.2d 274, 284 (2d Cir. 1973) (in the absence

REPORT AND RECOMMENDATION
PAGE - 22

of objective evidence of corroboratory circumstances, a defendant's claim after a guilty verdict that he should have been called to testify must be viewed with some suspicion, especially when a supporting affidavit of an attorney has not been submitted). Mr. Rafay indicates his counsel advised him that his testimony at the suppression hearing would pose the risk of alerting the State to his defense theory. And if Mr. Rafay did testify at the hearing, he would have been subject to cross-examination. CrR 3.5. Mr. Rafay has not shown that counsel had no legitimate tactical reasons for advising Mr. Rafay not to testify, and cannot show deficient performance in this regard. He also fails to show resulting prejudice. Mr. Rafay does not show that his testimony in the suppression hearing would have led to the granting of the motion to suppress. He claims that he would have testified that under the circumstances he felt trapped and in danger of being killed if he did not cooperate with the undercover detectives who posed as leaders of organized crimes. But on direct appeal the Court of Appeals observed that the evidence in the record included many hours of audio and video recordings that allowed the trial court to assess the effect of the undercover operations on the defendants including viewing the defendants' demeanor and body language during the confessions. *Rafay*, 168 Wn. App. at 764. The Court of Appeals found the evidence strongly supported the trial court's determination that defendants' confessions were voluntary. *Id*. at 765. Mr. Rafay has not demonstrated a reasonable probability that absent the claimed deficient performance of his attorney the result would have been different. *See Yates*, 177 Wn.2d at 48.

*Id*., Ex. 33 at 5-6.

Petitioner fails to demonstrate that this decision of the Washington Supreme Court is contrary to, or involved an unreasonable application of, federal law as decided by the United States Supreme Court, or that it was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

The record of the suppression hearing confirms that the Fourth Amendment issues predominated; *i.e.*, whether the private communications of defendants intercepted by the RCMP in Canada should be suppressed pursuant to the Fourth Amendment based on the Bellevue Police Department's alleged cooperation and assistance in the Canadian investigation. However, the suggestion that Petitioner's counsel misunderstood or ignored the law regarding application of the Fifth Amendment to the voluntariness of the confessions is refuted by the record. Petitioner's

REPORT AND RECOMMENDATION
PAGE - 23

counsel specifically argued in petitioner's motion to suppress that the statements of both defendants were coerced and involuntary in violation of the Fifth and Fourteenth Amendments. *See* Dkt. 52, Ex. 34, Appendix A at 23-26 and Appendix B at 10-22.  Petitioner's counsel also specifically argued during the parties' oral arguments on the motion to suppress that the confessions were coerced and involuntary in violation of the Fifth and Fourteenth Amendments. Dkt. 52, Ex. 69 at 127-134.  While it appears that counsel may have, on at least one occasion, conflated the Fourth and Fifth Amendment issues, *see id*., Ex. 34, Appendix A at 26, it also appears clear that counsel understood that the Fourth and Fifth Amendment issues were separate and involved the application of different standards.

Aside from an uncorroborated assertion made by petitioner in his declaration in support of his personal restraint petition, *see id*., Ex. 24, App. C at 2, nothing in the record establishes that petitioner's counsel advised him against testifying because of a misunderstanding of the applicable law.  Moreover, petitioner acknowledged in his declaration that counsel advised him his testimony at the suppression hearing would assist the state in various ways including: "(1) revealing potential defense testimony at trial; (2) providing advance notice of the ways in which we would demonstrate that the confessions were false contrivances; (3) explaining the cryptic intercepted messages through which Sebastian communicated to me certain details of the story he was improvising."  *Id*., Ex. 24, App. C at 3.

The record as a whole supports the conclusion that there were strategic reasons for counsel's recommendation that petitioner not testify at the suppression hearing.  The record also supports the conclusion that petitioner's testimony would likely not have resulted in the suppression of his statements to the undercover officers.  In fact, one of petitioner's trial attorneys, Marc Stenchever, submitted a declaration in support of petitioner's motion to modify the

REPORT AND RECOMMENDATION
PAGE - 24

1  Commissioner's ruling in his first personal restraint proceeding and acknowledged therein that he
2  did not believe the trial judge would grant the motions to suppress the statements of petitioner or
3  Mr. Burns and did not believe that any testimony by petitioner would have affected the outcome.
4  *Id.*, Ex. 34, App. E.   The state appellate courts reasonably rejected petitioner's ineffective
5  assistance of counsel claim and petitioner's second ground for federal habeas relief should
6  therefore be denied.

7  <u>Ground Three:  Right to Present a Defense</u>

8  Petitioner asserts in his third ground for relief that his rights under the Sixth and Fourteenth
9  Amendments to present a complete defense were violated when the trial court excluded "other
10  suspect" evidence and the testimony of two defense experts.  Dkt. 34 at 82.  More specifically,
11  petitioner complains about the exclusion of witnesses who would have presented an alternate
12  suspect theory by testifying to reports made to authorities about radical Muslim extremists who
13  may have been responsible for the murders of petitioner's family.  *Id.* at 82-83.  Petitioner also
14  complains about the exclusion of expert witnesses who could have established how operations like
15  Mr. Big are coercive in nature and how the incriminating statements made by petitioner and Mr.
16  Burns lacked reliability even if they seemed credible.  *Id.* at 83.

17  "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in
18  the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution
19  guarantees defendants 'a meaningful opportunity to present a complete defense.'"  *Crane v.*
20  *Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984))
21  (internal citations omitted).  However, the right to present a defense "is not unlimited, but rather
22  is subject to reasonable restrictions," such as evidentiary and procedural rules.  *United States v.*
23  *Scheffer*, 523 U.S. 303, 308 (1998).

REPORT AND RECOMMENDATION
PAGE - 25

The Supreme Court has explained that "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Id*. The Supreme Court has also noted its approval of "well-established rules of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such an unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006). The right to present a meaningful defense is implicated when exclusionary rules "infring[e] upon a weighty interest of the accused" and are "'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Id.* at 324 (citing *Scheffer*, 523 U.S. at 308).

## A.    Other Suspect Evidence

The other suspect evidence excluded by the trial court involved tips from sources purporting to have information concerning violent religious groups who may have been associated with the murders of the Rafay family. The Washington Court of Appeals summarized the proffered other suspect evidence as follows:

> *Douglas Mohammed*
>
> Several days after the murder, Douglas Mohammed, an FBI informant who had apparently provided "useful" information in the past, contacted the Bellevue Police Department and indicated he might have information relating to the Rafay murders. On the afternoon of July 18, 1994, Mohammed met with Detective Thompson and Detective Gomes. Mohammed identified an individual he characterized as the head of a local violent Muslim faction and claimed that the man "had indicated that Tariq Rafay should be killed because of [his] interpretation of the Koran."
>
> Mohammed told the detectives that on the Friday after the murders, one of the men belonging to the local faction came to Mohammed's house. The man, who appeared to be nervous and frightened, asked Mohammed if he had seen a baseball bat that members of the group had been carrying around. Mohammed had heard that the Rafay family was bludgeoned to death. He thought there might be a connection between the bat and the murders. His references to a bat came at a point

in the investigation when police had not yet publicly identified the possible murder weapon.

Detective Thompson thought Mohammed was "crazy" and not credible based in part on his demeanor, noting that Mohammed had "rambled on" and had identified "dozens of people, license numbers and telephone numbers of all sorts of people who might be involved in killing Mr. Rafay." Bellevue police spoke with Tariq's relatives and acquaintances, who reported that he was not a leader in his Muslim community and not involved in any religious conflicts. Nor were the Bellevue police aware of any violence in the local Muslim community. Because they found no indication that the murders were connected with a religious conflict or dispute, Bellevue police did not pursue Mohammed's information.

*FUQRA*

Several weeks after the murders, Seattle Police Detective Detmar contacted the Bellevue Police Department and said that an Islamic terrorist group known as FUQRA was "possibly associated" with the murders. According to Bellevue Police Officer Schneider,

> [Detmar said FUQRA] are based out of Toronto, and that they target Muslims who do not practice the faith or interpret the "Koran" as they do. Det. Detmar said that they punish these unfaithful persons by bombing, stabbing, and murdering them. He said that this group is very organized and they do contract assassinations [and] never take credit openly for its actions. . . . He elaborated by saying that on 8/1/84 there were four incidents associated with this "FUQRA" group and they included the bombing of the Seattle Trade Center, bombing in Denver, kidnapping in Kansas, [and] triple homicide in Tacoma.

*Rafay*, 168 Wash. App. at 797-99.[4]

The trial court excluded this proposed "other suspect" evidence, concluding that it was too speculative and did not meet the criteria for admissibility under Washington law. *See* Dkt. 52, Ex. 82 at 61-62. The Court of Appeals rejected petitioner's claim that the trial court's exclusion of the

---

[4] The Court of Appeals summarized additional proffered other suspect evidence pertaining to the Dosanjh Group, a Vancouver organized crime family, and an individual named Jesse Brar. *See Rafay*, 168 Wash. App. at 799. However, the trial court admitted that evidence and, thus, it is not at issue here.

REPORT AND RECOMMENDATION
PAGE - 27

other suspect evidence violated his right to present a defense.  The appellate court began its

analysis by setting forth the Washington rule pertaining to the admission of such evidence:

> Washington has long followed the rule that before a defendant may present evidence suggesting another person committed the charged offense, the defendant must first establish a sufficient foundation, including "'a train of facts or circumstances as tend clearly to point out'" someone besides the defendant as the guilty party.  The requisite foundation requires a clear nexus between the other person and the crime.  The proposed testimony must show a "step taken by the third party that indicates an intention to act" on the motive or opportunity.

*Id*. at 800.

The Court of Appeals went on to conclude that

> The Mohammed and FUQRA tips failed to establish any meaningful nexus between the alleged violent Muslim factions and the Rafay murders.  The "[m]ere evidence of motive in another party, or motive coupled with threats of such other person, is inadmissible unless coupled with other evidence tending to connect such other person with the actual commission of the crime charged."  The other suspect evidence here was far more speculative than that which courts have found sufficient to satisfy the necessary foundation. . . .  Under the circumstances, the trial court did not abuse its discretion in excluding the Mohammed and FUQRA tips as other suspect evidence.

*Id*. at 801-02 (footnotes omitted).

After concluding that the other suspect evidence was properly excluded under Washington

law, the appellate court went on to address, and reject, the argument that the exclusionary rule

itself was unconstitutional:

> Defendants suggest that Washington's foundational restrictions on other suspect evidence are unconstitutional, citing *Holmes v. South Carolina*.  In *Holmes*, the Court addressed a South Carolina rule allowing the exclusion of third party suspect evidence when the evidence against the defendant was strong, "even if that evidence, if viewed independently, would have great probative value and even if it would not pose an undue risk of harassment, prejudice, or confusion of issues.  But the *Holmes* court noted its approval of state rules limiting other suspect evidence, including the rule in Washington, when the evidence was speculative or remote or did not tend to prove or disprove a material fact.  *Holmes* therefore does not support the claim that Washington's other suspect limitation is unconstitutional.

REPORT AND RECOMMENDATION
PAGE - 28

*Id*. at 802-03 (footnotes omitted).

Petitioner argues that under clearly established federal law, a criminal defendants' rights are violated if the trial court erroneously excludes critical and reliable evidence. Dkt. 34 at 83. Petitioner suggests that the other suspect evidence at issue here constitutes such evidence because it "would have illustrated to the jury the likelihood that an alternate suspect had committed the crime." *Id*. Petitioner disputes the Court of Appeals' conclusion that the other suspect evidence was lacking in foundation and he argues that the testimony was integral to the defense. *See id*. at 85-86.

The Ninth Circuit has observed, with respect to Supreme Court precedent on the intersection of constitutional rights and state evidentiary rules, that the Supreme Court's cases have focused on whether an evidentiary rule, by its own terms, violates a defendant's right to present a defense. *See Moses v. Payne*, 555 F.3d 742, 757-58 (9th Cir. 2009); *see also Brown v. Horell,* 644 F.3d 969, 983 (9th Cir. 2011). As the Washington Court of Appeals explained in its opinion affirming petitioner's conviction, the United States Supreme Court, in *Holmes*, noted its approval of state rules limiting other suspect evidence such as the Washington rule. *See Rafay*, 168 Wash. App. at 802-03. It therefore cannot be said that the evidentiary rule underlying the exclusion of the proffered other suspect evidence violated petitioner's right to present a defense.

Notably, petitioner's argument does not appear to challenge the constitutionality of the exclusionary rule itself but, instead, focuses on the trial court's exercise of its discretion to exclude the other suspect evidence. As the Ninth Circuit noted in both *Moses* and *Brown*, the Supreme Court has not "squarely addressed" whether a trial court's exercise of discretion to exclude evidence violates a defendant's right to present a complete defense, nor has it clearly established a "controlling legal standard" for evaluating such exclusions. *See Moses*, 555 F.3d at 758; *Brown*,

644 F.3d at 983. Petitioner therefore cannot show that the Washington Court of Appeals' decision upholding the exclusion of the other suspect evidence is contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.

### B.    Expert Testimony

Petitioner also asserts that the trial court erroneously excluded expert witness testimony regarding false confessions and the Mr. Big sting operation. *See* Dkt. 34 at 86-90. The two proposed expert witnesses were Richard Leo and Michael Levine. Richard Leo was an associate professor of criminology and psychology who would have testified about false confessions and the circumstances which give rise to them. *See id.* at 86-7. Michael Levine was a retired agent of the Drug Enforcement Administration who would have testified about procedures and safeguards normally utilized in undercover operations in the United States, and how the lack of such procedural safeguards in the RCMP's Mr. Big operation could lead to false confessions. *See id.* Petitioner argues that the confessions to the RCMP undercover officers were the lynchpin of the state's case without which the defense could have built a strong case for reasonable doubt. *Id.* at 86. Petitioner maintains that absent the prohibition on the testimony of Dr. Leo and Mr. Levine, there is a substantial likelihood that the outcome of the trial would have been different. *Id.*

After extensive argument, the trial court excluded Dr. Leo's testimony, concluding that it was "within the common experience of people of ordinary experience and knowledge that people for a variety of reasons, limited only by the human imagination, tell lies . . . and this jury was questioned during its selection of that very proposition and indicated they would not at all be surprised if people did tell lies." *Rafay*, 168 Wash. App. at 783; Dkt. 52, Ex. 82 at 65. The Court went on to explain that ultimately what Dr. Leo would be testifying to was "that this was a coerced, compliant, false confession, and that is the final analysis and question for this jury to decide,

REPORT AND RECOMMENDATION
PAGE - 30

number one, if it's a confession, and number two, was it voluntary or was it coerced?" *Id.*

The trial court excluded the testimony of Mr. Levine for similar reasons, finding that, "in the final analysis, what he does is simply, again, invade the province of the jury to decide whether or not in their common experience and common sense these statements made by these defendants to those undercover police officers are voluntary or involuntary, are accurate or . . . 'or false bragging.'" *Rafay*, 168 Wash. App. at 792; Dkt. 52, Ex. 82 at 66. The trial court also concluded that there was no evidence in the record of generally accepted standards for undercover operations relating to murder investigations in Canada in 1994 and 1995 when the RCMP's undercover investigation was ongoing, nor was there anything in Mr. Levine's proffered findings indicating that there were such standards in the United States during the relevant time period. *Rafay*, 168 Wash. App. at 793; Dkt. 52, Ex. 82 at 67.

The Washington Court of Appeals, on direct review of petitioner's conviction, rejected petitioner's challenge to the trial court's exclusion of the testimony of Dr. Leo and Mr. Levine. The Court of Appeals reviewed the trial court's decision for an abuse of discretion under ER 702, noting that the only factor at issue on appeal was whether the proffered expert testimony would be helpful to the trier of fact. *See Rafay*, 168 Wash. App. at 783-84.

Following an extensive discussion of the proffered testimony of Dr. Leo, the Court of Appeals summarized its conclusion with respect to this proposed expert as follows:

> Leo was unable to testify about any meaningful correlation between specific interrogation methods and false confessions or provide any method for the trier of fact to analyze the effect of the general concepts on the reliability of the defendants' confessions. Given the defendants' alleged basis for their false confessions, such limitations rendered Leo's proposed testimony potentially confusing and misleading. Viewed in context, Leo's proposed testimony that if the confessions were false, they were coerced-compliant confessions, clearly implies an opinion that the confessions were unreliable.

REPORT AND RECOMMENDATION
PAGE - 31

Under the circumstances, the trial court's determination that Leo's proposed testimony would not be helpful and would invade the province of the jury was at least debatable. The trial court's exclusion of the proposed testimony was therefore not an abuse of discretion.

*Id*. at 789-90 (footnotes omitted).

With respect to the proffered testimony of Mr. Levine, the Court of Appeals concluded that the trial court did not abuse its discretion in excluding the testimony for the following reasons:

Based on his extensive "findings," Levine's proposed testimony clearly suggested his belief that the confessions were false. But as the trial court noted, the foundation for many of those conclusory findings is difficult to ascertain. Nor did Levine explain adequately his understanding of Canadian undercover investigation standards.

Levine clearly had significant experience with various undercover operations. But as defendants concede, there were no formal standards governing RCMP undercover operations in 1995. And as the trial court indicated, even if Levine could have testified about the standards governing United States undercover operations in 1995, those standards would be relevant only if there was evidence to support Levin's claim that the RCMP's failure to follow comparable standards resulted in a "high likelihood" that the confessions were false or unreliable. Levine's offer of proof is completely silent about the foundation for this claim.[5] Without such a foundation, Levine's proposed testimony about the inadequate undercover investigation and its coercive effects on the defendants would have been of no assistance to the jury. Based on the record before it, the trial court did not abuse its discretion in excluding Levine's testimony.

*Id*. at 794.

After concluding that the trial court did not abuse its discretion in excluding the expert witness testimony, the Court of Appeals turned to the question of whether exclusion of the evidence violated defendants' constitutional right to present a defense. *See id*. at 794-97. The appellate court determined that it did not, and explained its conclusion as follows:

---

[5] [Court of Appeals footnote 104] The trial court indicated a willingness to consider a *Frye* hearing, but neither party pursued that possibility.

REPORT AND RECOMMENDATION
PAGE - 32

1

2

The Supreme Court has repeatedly emphasized that the mere fact an evidentiary rule may reasonably exclude favorable evidence does not necessarily restrict the defendant from presenting a defense. Evidentiary rules impermissibly abridge a criminal defendant's right to present a defense only if they are "'arbitrary' or 'disproportionate'" and "infringe[ ] upon a weighty interest of the accused." The Supreme Court has generally found such an abridgement only when the evidentiary ruling effectively prohibited the substantive testimony of the defendant on matters relevant to the defense or the testimony of a percipient witness.

3

4

5

6

7

Given the limited scope of the proposed expert testimony, the trial court's ruling did not significantly restrict the defendants' ability to present a meaningful defense.

8

*Id*. at 796-97 (footnotes omitted).

9

10

11

12

13

14

15

16

17

18

Petitioner does not appear to argue that the evidentiary rule pursuant to which the expert testimony was excluded, by its own terms, violated his right to present a defense. Rather, he appears to once again focus his argument on the trial court's discretionary decision to exclude the evidence. As noted above in the discussion of petitioner's claim challenging the exclusion of the other suspect evidence, because the Supreme Court has not "squarely addressed" whether a trial court's exercise of discretion to exclude evidence violates a defendant's right to present a complete defense, or clearly established a "controlling legal standard" for evaluating such exclusions, petitioner cannot show that the state court's ruling was either contrary to or an unreasonable application of clearly established Supreme Court precedent. *See Moses*, 555 F.3d at 758; *Brown*, 644 F.3d at 983.

19

20

21

The Court notes as well that even if petitioner had challenged the exclusionary rule itself, his claim would still likely fail. In *Moses*, the Ninth Circuit specifically distinguished Rule 702, the rule under which the expert testimony was excluded in petitioner's case, from other evidentiary

22

23

REPORT AND RECOMMENDATION
PAGE - 33

1  rules the Supreme Court has held infringe on a defendant's right to present a complete defense.[6]

2  The Ninth Circuit explained that:

3      Rule 702 is different in kind from the rules in *Washington*, *Crane*, *Chambers*, *Rock*,
       and *Holmes*.  The evidentiary rules in those cases, by their terms, required the trial

4      court to exclude crucial evidence that had a critical effect on the trial, with little or
       no rational justification.    In general, the rules precluded a defendant from

5      testifying, excluded testimony from key percipient witnesses, or excluded the
       introduction of all evidence relating to a crucial defense.  In contrast, Rule 702 does

6      not require a trial court to exclude evidence.  Rather, it authorizes a court to admit
       expert testimony "if it will assist the trier of fact to understand the evidence or a

7      fact in issue."  *Farr-Lenzini*, 970 P.2d at 318 (internal quotation marks omitted).
       Accordingly, a decision that Rule 702 itself is constitutional would be consistent

8      with Supreme Court precedent.

9  *Moses*, 555 F.3d 758.

10      As petitioner makes no showing that the evidentiary rules pursuant to which his proffered

11  evidence was excluded, by their own terms, violated his right to present a defense, and as there is

12  no clearly established law governing the trial court's discretionary decisions to exclude the

13  evidence, petitioner's third ground for federal habeas relief should be denied.

14                          Ground Four:  Prosecutorial Misconduct

15      Petitioner asserts in his fourth ground for relief that repeated misconduct on the part of the

16  prosecutor during closing argument, and statements by key witnesses at trial offering opinions as

17  to petitioner's guilt, denied petitioner a fair trial in violation of the Sixth Amendment.  Dkt. 34 at

18

---

19      [6] *See, e.g., Holmes*, 547 U.S. at 328-31 (evidentiary rule preventing defendant from presenting evidence of
   third-party guilt based solely on trial court's assessment of prosecution's evidence violated defendant's right to a fair

20  trial); *Rock v. Arkansas*, 483 U.S. 44, 61 (1987) (evidentiary rule barring all of the defendant's hypnotically refreshed
   testimony violated defendant's right to present a defense); *Washington v. Texas*, 388 U.S. 14, 23 (1967) (evidentiary

21  rule precluding alleged accomplice from testifying on defendant's behalf violated defendant's right to have
   compulsory process for obtaining witnesses); *see also Crane v. Kentucky*, 476 U.S. 683, 691 (1986) (recognizing

22  constitutional violation where state evidentiary rule precluded defendant from introducing any evidence relating to
   the unreliability of his own confession); *Chambers v. Mississippi*, 410 U.S. 284, 297-98, 302 (1973) (concluding
   defendant's right to a fair trial was violated when combined effect of two state evidentiary rules precluded him from

23  cross-examining witness he alleged was the actual wrongdoer).

REPORT AND RECOMMENDATION
PAGE - 34

90.  In the first section of his fourth ground for relief, petitioner identifies three specific examples of prosecutorial misconduct that occurred during closing argument and which petitioner claims tainted his trial: (1) the prosecutor repeatedly compared petitioner and Mr. Burns to Middle Eastern terrorists who had recently beheaded an American citizen and filmed the execution for worldwide broadcast; (2) the prosecutor told jurors his father had just died in an improper attempt to garner sympathy and establish a shared experience with jurors who had also suffered a recent loss; and (3) the prosecutor improperly impeached a witness integral to petitioner's alibi by telling jurors she smelled of alcohol while testifying in court.  *Id*. at 92.  Petitioner also asserts that the prosecutor improperly attacked the defendants' credibility by calling them deceitful and describing their protestations of innocence as "stories," and that the prosecutor then improperly argued to the jury that they had to either believe everything Mr. Burns said or everything the undercover officers said.  *Id*. at 93.

In the second section of his fourth ground for relief, petitioner asserts that key prosecution witnesses, including Detective Jeff Gomes, Officer Greg Neese, Officer Lisa Piculell, and Officer Stephen Cercone, expressed improper opinions on the veracity of the accounts given by petitioner and Mr. Burns to the police immediately following the discovery of the murders and on the defendants' underlying guilt.  *Id*. at 96.

When a prosecutor's conduct is placed in question, unless the conduct impermissibly infringes on a specific constitutional right, the standard of review is the "narrow one of due process, and not the broad exercise of supervisory power."  *Darden v. Wainwright*, 477 U.S. 168, 181-82 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 642-43 (1974).  To obtain relief on a claim of prosecutorial misconduct, a federal habeas petitioner must do more than show that "the prosecutor's remarks were undesirable or even universally condemned."  *Darden*, 477 U.S. at 180-

REPORT AND RECOMMENDATION
PAGE - 35

81.  A petitioner must demonstrate that the allegedly improper comments made by the prosecutor "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643).

In order to assess a claim that a prosecutor's comments rendered a trial so fundamentally unfair as to deny a petitioner due process, it is necessary to examine the entire proceedings and place the prosecutor's statements in context.  *See Greer v. Miller*, 483 U.S. 756, 765-66 (1987).  A reviewing court must keep in mind that during closing argument a prosecutor has wide latitude to make reasonable inferences based on the evidence.  *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991).

Prosecutorial misconduct which rises to the level of a constitutional violation nonetheless provides a basis for federal habeas relief only if the misconduct is deemed prejudicial under the test announced by the Supreme Court in *Brecht*.  *See Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004).  Under *Brecht*, habeas relief may be granted only if an error "had substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

## A.    Closing Argument

Petitioner essentially identifies four instances of alleged misconduct during closing argument, each of which was evaluated by the Court of Appeals, on direct appeal.  The Court of Appeals began its assessment of the asserted prosecutorial misconduct claims by identifying the standard applicable to such claims:

> A defendant alleging prosecutorial misconduct bears the burden of demonstrating that the challenged comments were both improper and prejudicial.  Misconduct is prejudicial if there is a "*substantial likelihood*" that it affected the jury's verdict. We review misconduct claims in the context of the total argument, the evidence addressed, the issues in the case, and the jury instructions.

REPORT AND RECOMMENDATION
PAGE - 36

1

2         If a defendant fails to object, we will not review the alleged misconduct
     unless it was so flagrant and ill-intentioned that no instruction could have cured the

3         resulting prejudice.  If the prosecutor flagrantly or intentionally appeals to racial
     bias "in a way that undermines the defendant's credibility or the presumption of

4         innocence," a court will vacate the conviction unless it appears beyond a reasonable
     doubt that the misconduct did not affect the jury's verdict.

5    *Rafay*, 168 Wash. App. at 824 (footnotes omitted).  The appellate court then went on to address

6    each of the instances of alleged misconduct separately.

7            *1.  Comparison of Murders to Terrorist Beheading*

8         The first of the challenged comments involved the comparion of the Rafay family murders

9    to a terrorist beheading.  As the Court of Appeals noted, shortly after the prosecutor began his

10   closing argument he made a series of references to the beheading of an American citizen which

11   had been in the news, comparing the murders of the Rafay family to that beheading and suggesting

12   that defendants had "executed" petitioner's parents and his sister.  *See id*. at 825-27; Dkt. 52, Ex.

13   86 at 37-42.  Defense counsel objected following the prosecutor's initial reference to the beheading

14   and the trial court noted the objection but indicated it was going to allow the parties some latitude

15   in argument.  Dkt. 52, Ex. 86 at 37.  Defense counsel later moved for a mistrial based on these

16   comments which the trial court denied.  *Id*., Ex. 86 at 124-25.

17        At the beginning of the third day of closing argument, after the prosecutor and petitioner's

18   counsel had completed their closing arguments, the state proposed a curative instruction, noting

19   that there might have been "a significant misunderstanding" about the reference to the beheading

20   and explaining that the purpose of the analogy was to demonstrate defendants' "complete lack of

21   empathy."  *See id*., Ex. 88 at 3-7.  The trial court offered to give a curative instruction, but the

22   defense never requested one.  *See id*., Ex. 88 at 8-9.

23        Defendants argued on appeal that the prosecutor's argument comparing the murders to the

REPORT AND RECOMMENDATION
PAGE - 37

beheading was an attempt to inflame the jury's passions and encourage a decision based on ethnic, cultural, religious, or patriotic prejudices.  The Court of Appeals agreed that the comments were "highly improper," but concluded that there was no substantial likelihood that the comments affected the outcome of the trial.  *Rafay*, 168 Wash. App. at 828.  The Court of Appeals explained its conclusion as follows:

> By referring to the recent, well-publicized beheading, the prosecutor introduced matters that were not in evidence but perhaps were already on the minds of the jurors.  The comments invoked the disturbing images that accompanied newspaper articles of the beheading, as well as the Internet video itself, and could well have engendered a strong emotional response among jurors completely unrelated to the facts of the charged offenses.  And the circumstances surrounding the beheading had at least the potential to resonate with any racial, religious, or ethnic prejudice among jurors.  The State's proposed curative instruction clearly suggests that the deputy prosecutors recognized this possibility.

> The State claims that the deputy prosecutor properly referred to the "horrible" nature of the crime scene in conjunction with the argument that the defendants' reactions to that crime scene were consistent with guilt.  This contention is not persuasive.

> The State is not precluded from accurately characterizing the nature of the horrific crime.  But the prosecutor also has a duty to seek verdicts that are free from appeals to passion or prejudice.  Given the evidence that was properly before the jury, including images that the deputy prosecutor projected as he spoke, the references to current events were entirely gratuitous.

> We must, however, assess the effect of the improper comments in light of all of the surrounding circumstances, including the lengthy trial and the remainder of the closing argument.  Unlike the cases cited by the defendants the improper comments here were not an open call to convict the defendants on the basis of racial, ethnic, or religious prejudices.

> . . . .

> Here, the improper comparisons occurred during a minor portion of the lengthy closing argument.  The deputy prosecutor did not compare the defendants directly with the terrorists or elaborate on the political motives underlying the terrorists' actions.  Rather, he continued with the general theme—the violence of the murders—by focusing on the evidence properly before the jury and illustrating the arguments with photographs of the scene. . . .

REPORT AND RECOMMENDATION
PAGE - 38

1

2           When viewed in context, the alleged racial, religious, and ethnic connotations ascribed to the improper comments are too attenuated to bear the weight that defendants accord them. . . . We conclude that under the circumstances, there was no substantial likelihood that the references to the beheading affected the outcome of the trial.

3

4

5      *Id*. at 829-832 (footnotes omitted).

6           The Court of Appeals, consistent with United States Supreme Court authority, evaluated

7      the prosecutor's challenged comments in the context of the record as a whole and reasonably

8      concluded that the comments, though improper, did not affect the outcome of the trial. The Court

9      of Appeals noted that the closing argument was lengthy. In fact, closing arguments spanned a

10     period of three days, *see* Dkt. 52, Exs. 86, 87, 88, and the prosecutor's initial closing argument

11     alone lasted for over 6 hours, *see id*., Ex. 87 at 115. The references to the beheading were, indeed,

12     a minor portion of the prosecution's closing argument. Moreover, despite petitioner's

13     characterization to the contrary, the prosecutor did not compare the defendants directly with

14     Middle Eastern terrorists but, rather, compared the murders to the beheadings. *See id*., Ex. 86 at

15     37-42. The prosecutor did so in the context of emphasizing the extreme violence involved in the

16     murders as he showed jurors photographs of the crime scene and discussed other properly admitted

17     evidence. *Id*.

18          Finally, it is important to note that the jury was instructed on at least three occasions that

19     the attorneys' "remarks, statements, and arguments" were not evidence and were to be disregarded

20     if not supported by the evidence or the law. *See id*., Ex. 86 at 7, 64 and Ex. 88 at 192. One of

21     those instructions was given a relatively short time after the prosecutor's references to the

22     beheading. *See id*., Ex. 86 at 64. Jurors are presumed to follow their instructions, *see Weeks v.*

23     *Angelone*, 528 U.S. 225, 234 (2000) (citing, *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)), and

REPORT AND RECOMMENDATION
PAGE - 39

1    nothing in the record before this Court suggests that they did not do so in this instance

2      Petitioner has simply not demonstrated that the prosecutor's remarks regarding the

3    beheading, when viewed in context and in light of the argument as a whole, "so infected the trial

4    with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at

5    181.  Thus, this portion of petitioner's prosecutorial misconduct claim fails.

6         *2. Reference to Father's Death*

7      The second instance of alleged misconduct occurred during rebuttal closing argument when

8    the prosecutor made reference to the recent death of his father and encouraged jurors who had not

9    lost a parent "to go back there and listen to the people who have . . . and then you attempt to make

10   sense of the way that these defendants laughed and giggled and snickered at the notion of their

11   family, that is Atif Rafay's family, being murdered."  Dkt. 52, Ex. 88 at 181.  The defense later

12   moved for a mistrial based on this argument, but the trial denied the motion despite expressing

13   concern about the remarks.  *Id.*, Ex. 88 at 204-06.  The Court of Appeals agreed that this comment

14   constituted an improper emotional appeal but concluded there was no reasonable likelihood the

15   improper comment affected the jury's verdict because the comment was a brief and isolated

16   assertion, and the prosecutor immediately moved on to asking the jury to draw inferences based

17   on the evidence.  *Rafay*, 168 Wash. App. at 832.

18     The Court of Appeals reasonably concluded that though the prosecutor's reference to his

19   father's death was improper, there is no reasonable likelihood that the comment affected the jury's

20   verdict.  The comment was, indeed, extremely brief and was made during the course of an hours

21   long closing argument.  Moreover, as noted above, the jury was instructed multiple times that the

22   attorneys' arguments were not evidence, and the jury is presumed to have followed those

23   instructions.  Petitioner fails to demonstrate that the prosecutor's remarks referencing his father's

REPORT AND RECOMMENDATION
PAGE - 40

1  death, when viewed in context, were so egregious as to implicate due process concerns.  Thus, the

2  second portion of petitioner's prosecutorial misconduct claim fails as well.

3              *3.  Impeachment of Jennifer Osteen*

4          The third instance of alleged misconduct occurred when the prosecutor implied that a

5  defense witness, Jennifer Osteen, was intoxicated at the time she testified.  Ms. Osteen's testimony

6  was relevant to the defendants' alibi as she testified that she saw the defendants in downtown

7  Seattle as early as midnight on the night the murders occurred.  *See* Dkt. 34 at 92.  According to

8  petitioner, this testimony established that he and Mr. Burns could not have left the movie theater

9  and committed the murders before going to the Seattle restaurant where Ms. Osteen worked as a

10 waitress.  *See id*.

11         The prosecutor commented during the state's initial closing argument that Ms. Osteen

12 "could hardly get up and down the stairs when she testified for you."  Dkt. 52, Ex. 86 at 68-9.  The

13 prosecutor  then reminded the jury of the instruction allowing them to consider a witness's manner,

14 memory, and demeanor while testifying in determining the witness's credibility, and encouraged

15 them "to remember the way [Osteen] had to navigate the stairs, both, into and out of the

16 courtroom."  *Id*., Ex. 86 at 69.  The defense did not object to these comments though, during the

17 defense closing, petitioner's counsel referred to the comments as a "cheap shot" and suggested

18 that the witness had been "obviously terrified."  *Id*., Ex. 88 at 55.

19         The prosecutor returned to the issue during rebuttal argument, commenting as follows:

20         Let me tell you, last week was a challenge when Ms. Osteen was here, and I tried
           to be as polite as I could with her, but you saw the way she went up the stairs and
21         you saw the way she came down, and I smelled the way she was when she went up
           and down the stairs.
22

23 *Id*., Ex. 88 at 150.  Defense counsel objected, and the trial court sustained the objection and

REPORT AND RECOMMENDATION
PAGE - 41

instructed the jury to disregard the remark. *Id.* The prosecutor then moved on to a more evidence-based argument concerning Ms. Osteen's credibility. *Id.*, Ex. 88 at 151. The trial court subsequently denied a defense request for a mistrial based on the prosecutor's comments about Ms. Osteen, concluding that the curative instruction previously given had cured any prejudice. *See id.*, Ex. 88 at 174-75.

Once again, the Court of Appeals concluded that the prosecutor's comments were improper, but did not affect petitioner's right to a fair trial. The appellate court explained its conclusion as follows:

> The deputy prosecutor has wide latitude to draw reasonable inferences from the evidence. But the prosecutor may not refer to evidence that was not presented at trial. By reciting his personal observations of Osteen as she entered and left the witness stand, the deputy prosecutor improperly introduced evidence not presented at trial and not properly before the jury for consideration.

> Defendants argue that Osteen was a crucial defense witness and nothing short of a mistrial would have cured the resulting prejudice. No one reported seeing the defendants between about 10:00 p.m., shortly after the movie began, and when they appeared at Steve's Broiler. The State maintained that the intervening period was sufficient for the defendants to commit the murders and clean up. The defendants' arrival time at the restaurant was therefore important to both sides' theory of the case.

> Osteen testified that she saw or spoke to the defendants "around 12:00, 12:30 [a.m.]" She characterized their appearance as "grubby," suggesting they had not cleaned up recently, and expressed her belief that the Bellevue police had attempted to persuade her to change her time estimate. But the State's witnesses—other waitresses at the restaurant—testified that the defendants arrived at the restaurant sometime after 12:15 a.m. or 12:30 a.m., and as late as 12:50 a.m. Osteen's general time estimates were therefore not fundamentally at odds with the testimony of the other witnesses, and the discrepancies in the perceived arrival times are not sufficient to completely undermine either side's theory of the case.

> The trial court quickly sustained the defense's objection and directed the jury to disregard the remark. The deputy prosecutor immediately moved on to a proper argument. The court also repeatedly instructed the jury that counsel's arguments were not evidence. Under the circumstances, the trial court's curative instruction was sufficient to obviate any potential prejudice. The improper

REPORT AND RECOMMENDATION
PAGE - 42

1  comments did not affect the defendants' right to a fair trial.

2  *Rafay*, 168 Wn. App. at 833-35 (footnotes omitted).

3      The Court of Appeals reasonably concluded that the prosecutor's improper comments

4  regarding Ms. Osteen did not violate petitioner's right to a fair trial.  A review of the testimony of

5  the three waitresses who testified regarding the defendants' presence at Steve's Broiler on the night

6  of the murders reveals that all three, Ms. Osteen, Karen Lundquist, and Christine Mars testified

7  that defendants could have been at the restaurant as early as midnight.  *See* Dkt. 52, Ex. 89 at 79;

8  Ex. 90 at 211-12; Ex. 91 at 30.  Thus, as the Court of Appeals concluded, Ms. Osteen's time

9  estimates were consistent with the testimony of the other witnesses.

10     Moreover, the trial court immediately sustained the defense's objection during rebuttal

11  closing argument and directed the jury to disregard the remark.  The jury was specifically

12  instructed prior to closing argument that it was to disregard any matters ordered stricken by the

13  court, *see* Dkt. 52, Ex. 86 at 6, and, of course, that the attorneys' arguments were not evidence.

14  The jurors are presumed to have followed the court's instructions and petitioner makes no showing

15  that they failed to do so in this instance.  Petitioner once again fails to demonstrate that the

16  prosecutor's remarks prejudiced the outcome of his trial.  Thus, the third portion of petitioner's

17  prosecutorial misconduct claim also fails.

18         *4.  Believing Mr. Burns or Believing the Undercover Officers*

19     The fourth instance of alleged misconduct cited by petitioner in his amended petition

20  relates to the prosecutor's argument that in order to decide the case the jury had to either believe

21  everything Mr. Burns testified to at trial or everything the RCMP officer testified to.[7]  Dkt. 34 at

22

23
_____

[7]  Petitioner also complains that the prosecutor repeatedly called defendants deceitful, described their protestations of innocence as "stories," and told jurors they could not believe anything defendants said.  Dkt. 34 at 93.

REPORT AND RECOMMENDATION
PAGE - 43

93.  This argument came near the end of the prosecutor's rebuttal argument and the defense raised

no objection to the argument.  The Court of Appeals, on direct review, concluded that this portion

of the prosecution's argument did not amount to misconduct:

> [W]hen viewed in context, the comment merely highlighted the obvious fact that
> the two accounts were fundamentally and obviously *different*.  The remarks were
> therefore analogous to those approved in *State v. Wright*, where the court concluded
> that when the parties present the jury "with conflicting versions of the facts and the
> credibility of witnesses is a central issue, there is nothing misleading or unfair in
> stating the obvious:  that if the jury accepts one version of the facts, it must
> necessarily reject the other."  The challenged comments were not misconduct.

*Rafay*, 168 Wash. App. at 837 (footnote omitted).

Petitioner makes no showing whatsoever that this challenged comment was either improper

or that it affected the outcome of his trial. The Court of Appeals reasonably rejected the claim on

direct appeal and the fourth portion of petitioner's prosecutorial misconduct claim therefore fails.

## B.    Improper Opinion Testimony

Petitioner contends that he was prejudiced by improper statements made by multiple law

enforcement officers during their testimony at trial.  Dkt. 34 at 95.  Petitioner first cites to testimony

from Bellevue Police Detective Jeff Gomes in which the detective expressed his opinion about the

veracity of statements petitioner made to officers following the murders.  Petitioner told officers

that he went into his father's bedroom and stood near a white bookshelf, and that he saw a large

blood splatter on the wall and his father's feet from that vantage point even though it was dark.

*See Rafay*, 168 Wash. App. at 810.  Detective Gomes returned to the Rafay home on August 9,

---

These comments were scattered throughout the prosecutor's initial closing argument and the defense raised no objection to any of these brief comments.  *See* Dkt. 52, Ex. 86 at 34, 138, 163-64; Ex. 87 at 35.  It is not clear that petitioner's argument pertaining to these comments was ever presented to the state appellate courts for review but, in any event, petitioner fails to demonstrate that the comments were improper or, in any event, that they had an affect on the outcome of the trial.

REPORT AND RECOMMENDATION
PAGE - 44

1994 at approximately 11:00 p.m. in an effort to re-create the lighting conditions in the bedroom at the time of the murder. *Id*. Detective Gomes testified that "I wanted to personally view what he said he did and then weigh what he was saying to me. Was it accurate or inaccurate or was it fabricated or not." *Id*. Detective Gomes went on to testify that he stood next to the white bookshelf with only the hall light on and that he "personally could not see the detail that [petitioner] was talking about." *Id*. Detective Gomes, in explaining why he thought the reenactment answered a question, stated, "I don't believe [petitioner] saw what he said he saw." *Id*. The trial court sustained a defense objection to this testimony and instructed the jury to disregard the detective's conclusion. *Id*.

Petitioner cites to other instances of improper statements by Detective Gomes as well. *See* Dkt. 34 at 95. Detective Gomes testified that he urged petitioner several times to contact extended family members about funeral arrangements, and that petitioner repeatedly rejected this advice. *Rafay*, 168 Wash. App. at 808-09. When Detective Gomes was asked what he observed petitioner doing instead of calling his family, Detective Gomes testified, "You know, he was just chillin' with his buddy." *Id*. at 809. The trial court sustained a defense objection to this testimony and instructed the jury to disregard the detective's characterization of petitioner's behavior. *Id*. Later in his testimony, again with respect to the issue of petitioner failing to contact other relatives and help make necessary funeral arrangements, Detective Gomes testified, "The issue was why wasn't he doing it? He was watching videos, movies, he was reading." *Id*. The trial court sustained a defense objection to this testimony and ordered that the detective's description of petitioner's activities be stricken. *Id*.

Finally, Detective Gomes testified that the defendants were able to recount events that occurred in the hours before the murder in "tremendous detail" but did not remember details about

REPORT AND RECOMMENDATION
PAGE - 45

1    events of the preceding days.  *Id*.  Detective Gomes then commented, "now[,] whether they

2    couldn't give me information or were not willing to give me information. . . ."  The trial court

3    sustained a defense objection to this comment and ordered that the detective's response be stricken.

4    *Id*.

5        The Court of Appeals, in evaluating Detective Gomes's challenged statements, explained

6    that the primary issue was "whether the remarks were so prejudicial that this court cannot presume

7    the jury followed the curative instructions."  The appellate court went on to conclude as follows:

8            Gomes's editorial comments and the expression of his personal belief about
        Rafay's ability to see the blood spatters on the wall were clearly improper.  The
9        State does not suggest otherwise.  But Gomes testified, in great detail and without
        objection, about Rafay's inability or unwillingness to contact his relatives after the
10       murders and about his other observations of Rafay's actions before Burns and
        Rafay left for Canada.  Gomes also testified, without objection, about the purpose
11       of the lighting re-creation, which was to determine whether Rafay's description was
        "inaccurate or . . . fabricated" and the fact that he was unable to see the detail Rafay
12       had reported.

13           Because the jury had before it substantial evidence about these matters and
        Gomes's challenged comments did not inject any new issues or details, the potential
14       prejudice of the improper remarks was significantly reduced.  The defendants do
        not allege that the State repeated or based any argument on the improper comments,
15       and the jury was also instructed that it was the sole judge of credibility.  Under the
        circumstances, we are convinced that in each instance, the jury was able to follow
16       the trial court's prompt curative instructions and make its factual determination
        based solely on the evidence properly admitted.

17

18   *Id*. at 810-11 (footnote omitted).

19       Petitioner also claims that improper opinion testimony by Bellevue Police Officers Greg

20   Neese, Lisa Piculell, and Stephen Cercone violated his right to a fair trial.  Dkt. 34 at 96.  Each of

21   these officers responded to the 911 call from the Rafay home on the night of the murders and each

22   observed the defendants outside the home.  *See id*.  Petitioner cites to testimony by Officer Neese

23   that Mr. Burns gave him a "grin" that "kind of shocked" him, testimony by Officer Piculell

REPORT AND RECOMMENDATION
PAGE - 46

describing petitioner as "somewhat robotic," and testimony by Officer Cercone describing petitioner as "surprised and very concerned" when he was advised he would have to go to the station to talk in more detail to the investigating detectives. *See id*. (citing *Rafay*, 168 Wash. App. at 806-08).

The trial court sustained defense counsel's objections to each of these statements and ordered that the challenged testimony of Officers Neese and Cercone be stricken. *See Rafay*, 168 Wash. App. at 806-07. The trial court responded to the challenged testimony of Officer Piculell by asking her to describe what she saw in words. *Id*. at 807. She then explained, without objection, that petitioner "made eye contact with me. He answered the questions directly, without elaboration, and he seemed—and he was smoking as he was doing that." *Id*.

The Court of Appeals addressed the challenges to the testimony of these officers as follows:

> Testimony that Burns's grin "kind of shocked" an officer and that Rafay appeared "robotic" and "very concerned" cannot reasonably be construed as direct comments on the guilt or veracity of the defendants. Rather, the comments were primarily an attempt to describe the defendants' demeanor. Washington courts have repeatedly found comparable comments admissible when based on a proper foundation of factual observations that directly and logically support the witness's conclusion. The officers here testified, without objection, in considerable detail about their observations of the defendants' demeanor. When viewed in context, the jury would likely have viewed the comments as a reference to the defendants' behavior rather than as an indirect opinion on guilt or veracity. And in any event, the challenged comments were brief and isolated, and the trial court immediately directed the jury to disregard them. Under the circumstances, the curative instruction was sufficient to remedy any potential prejudice.

*Id*. at 807-08 (footnotes omitted).

Respondent argues that petitioner's claim related to the testimony of the law enforcement officers, as presented in the amended petition, is unexhausted. Dkt. 51 at 51. Respondent observes that this claim appears to be raised in the context of petitioner's prosecutorial misconduct claim, noting that the only case law cited in the portion of petitioner's argument related to the claim are

REPORT AND RECOMMENDATION
PAGE - 47

cases which set forth the standard for reviewing claims of prosecutorial misconduct.  *Id.*  Respondent also observes that petitioner argues in his amended petition that the prosecution intentionally elicited this testimony from the officers in order to paint a picture of petitioner and Mr. Burns as callous individuals and "kept asking questions designed to elicit inflammatory comments."  *Id.*  Respondent asserts that petitioner argued in state court only that the challenged testimony of the law enforcement officers constituted improper opinion testimony regarding the guilt and/or veracity of the defendants, not that the prosecutor's questioning of these witnesses amounted to misconduct.  *See id.*; Dkt. 52, Ex. 4 at 155-162 and Ex. 13 at 31-33, 38.  Thus, respondent argues, the claim is unexhausted.

Respondent further argues that, to the extent petitioner is actually arguing the witnesses presented improper opinion as to his guilt, he fails to cite any federal law supporting his claim that the challenged testimony violated his federal rights.  Dkt. 51 at 52.  Respondent goes on to argue that there is, in fact, no clearly established federal law that would support this claim.  *Id.*

Petitioner, in his response to respondent's answer, disputes respondent's assertion that the claim is unexhausted, arguing that he included these arguments in his briefs in the Washington appellate courts.  Dkt. 57 at 28.  While it is true that petitioner challenged the police officers' allegedly improper statements in the state courts, it is disingenuous for petitioner to suggest that he presented the arguments as a part of his prosecutorial misconduct claim when it is abundantly clear from the portions of the appellate court briefs cited by petitioner that he did not.  *See id.*  Petitioner's claim that the prosecutor committed misconduct by eliciting improper statements from the police officers was not properly exhausted and therefore is not properly before the Court.

Construing the second section of petitioner's fourth ground for relief as presenting a challenge to the statements themselves, and not to the prosecutor's alleged role in eliciting the

REPORT AND RECOMMENDATION
PAGE - 48

statements, respondent is correct that petitioner has identified no clearly established federal law to support his claim. Accordingly, this section of petitioner's fourth ground for relief must be denied as petitioner makes no showing that the appellate court's resolution of the claim is contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.

<u>Certificate of Appealability</u>

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of his federal habeas petition only after obtaining a certificate of appealability (COA) from a district or circuit judge. A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Under this standard, this Court concludes that petitioner is not entitled to a certificate of appealability with respect to any of the claims asserted in his amended petition.

<u>CONCLUSION</u>

Based on the foregoing, this Court recommends that petitioner's amended petition for writ of habeas corpus be denied and that this action be dismissed with prejudice. This Court also recommends that a certificate of appealability be denied with respect to all claims asserted in this federal habeas action. A proposed order accompanies this Report and Recommendation.

<u>OBJECTIONS</u>

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report

REPORT AND RECOMMENDATION
PAGE - 49

and Recommendation is signed.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14) days** after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on **February 21, 2020**.

DATED this 28th day of January, 2020.


Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 50